IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | CASE NO. 4:25-CR-00531-7 |
| | § | HOUSTON, TEXAS |
| VERSUS | § | FRIDAY, |
| | § | OCTOBER 24, 2025 |
| YIYANG WU | § | 1:02 P.M. TO 2:10 P.M. |

**DETENTION HEARING**

BEFORE THE HONORABLE CHRISTINA BRYAN
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:                          SEE NEXT PAGE

ELECTRONIC RECORDING OFFICER:    AMY PEARSON

COURTROOM CLERK:                 MELISSA MORGAN

COURT INTERPRETER:               JUNE HU

PRETRIAL SERVICES:               FRANCESCA SONNE

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
mary@judicialtranscribers.com

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

**APPEARANCES**:


FOR THE PLAINTIFF:                    US ATTORNEY'S OFFICE
                                      John Sergei Ganz, Esq.
                                      1000 Louisiana Street
                                      Suite 2300
                                      Houston, TX  77002
                                      713-567-9920


FOR THE DEFENDANT:                    BENNETT & BENNETT
                                      Mark W. Bennett, Esq.
                                      917 Franklin Street
                                      Fourth Floor
                                      Houston, TX  77002
                                      713-224-1747

**INDEX**

| WITNESS: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| VINCENT LUU | | | | |
| By Mr. Ganz | 6 | . | 50 | . |
| By Mr. Bennett | . | 40 | . | 51 |
| EMILY NGUYEN | | | | |
| By Mr. Bennett | 53 | . | 62 | . |
| By Mr. Ganz | . | 59 | . | . |

| EXHIBITS: | Marked | Offered | Received |
|---|---|---|---|
| (None offered) | | | |

| CLOSING ARGUMENTS: | |
|---|---|
| By Mr. Ganz | 63 |
| By Mr. Bennett | 64 |

| COURT'S RULING: | |
|---|---|
| | 65 |

***

**HOUSTON, TEXAS; FRIDAY, OCTOBER 24, 2025; 1:02 P.M.**

(Official Court Interpreter utilized for translation.)

THE COURT:  All right.  We're scheduled for a detention hearing in United States versus Yiyang Wu.

Is everyone present and ready to proceed?

MR. GANZ:  Good afternoon, Your Honor.

John Ganz, for the United States, ready.

THE COURT:  Thank you.

MR. BENNETT:  Good afternoon, Your Honor.

Mark Bennett for Mr. Wu, who's also present. We're ready, and our witness, I think, is logged into the Zoom remotely.

THE COURT:  Okay.

MR. BENNETT:  But I don't see anything on the screen.

THE COURT:  I don't -- that's our number on the screen.  So, I don't see your witness.

MR. BENNETT:  There she is, but we don't need her immediately because Mr. Ganz is going to make his presentation first.

MR. GANZ:  I believe so, yeah.

THE COURT:  Okay.  Mr. Ganz, remind me of the basis of the Motion for Detention.

MR. GANZ:  Risk of flight.  It's a risk of flight under (f)(2), I believe, (A), or (f)(2) --

THE COURT:  3142(f)(2)?

MR. GANZ:  Yes.  This is not a presumption case.

THE COURT:  Okay.  Okay, you may call your first witness.

MR. GANZ:  Thank you.

The United States calls Special Agent Vincent Luu.

And Judge --

THE COURT:  Yes?

MR. GANZ:  These are reports.  The witness may or may not be examined on them, but this is the Court's copy.

THE COURT:  Have you given them to Defense counsel?

MR. GANZ:  Yes.

THE COURT:  Okay.  Give me one more second.

And for the record, the Defendant is wearing a headset.  We have an interpreter here who is translating the proceedings into Mandarin for the Defendant.

Are you able to hear the Interpreter through the headset?

DEFENDANT WU:  Yes, I can hear.

THE COURT:  Okay.  And just for the record, I want to make sure that we just have direct translation of the question and the answer.  I guess we're not doing simultaneous?

COURT INTERPRETER:  Yes, I am doing simultaneous.

THE COURT:  You are doing simultaneous, okay.  All right.

Okay.  Do you want to swear the Witness?

THE CLERK:  Yes, Judge, I'd be happy to.

Can you raise your right hand?

(The Witness sworn.)

THE COURT:  You may proceed.

MR. GANZ:  Good afternoon, sir.

THE WITNESS:  Good afternoon, sir.

DIRECT EXAMINATION OF VINCENT LUU

BY MR. GANZ:

Q    Please state your name and spell it.

A    My name is Vincent Luu, V-I-N-C-E-N-T, L-U-U.

Q    How are you employed?

A    I'm a Special Agent with the ATF.

Q    That's the Bureau of Alcohol, Tobacco, Firearms and Explosives?

A    Yes, sir.

Q    How long have you been an ATF Special Agent?

A    About 7 years.

Q    What are your basic duties as a Special Agent?

A    Investigate a wide range of federal violations, federal criminal violations.

Q    So, you're investigating violations of federal firearms laws?

A    Correct.

Q    Any law enforcement experience prior to ATF?

A    Yes, sir.

Q    What is that?

A    I was a police officer for the City of Philadelphia for about 5 years.

Q    Okay --

            BY THE COURT:  For which city?

            THE WITNESS:  City of Philadelphia, Pennsylvania.

BY MR. GANZ:

Q    I'm going to start off by asking you some background questions.

A    Yes, sir.

Q    Then, we're going to talk generally about the conspiracy that's charged in this Indictment.

A    Yes, sir.

Q    Then, we will drill down to specific counts relevant to the Defendant.

A    Yes, sir.

Q    So, first, in general, how does one make a legal purchase of firearms under federal law?

A    They would have to go to a gun store and obtain a firearm through a gun store.

Q    Okay --

            BY THE COURT:  I am going to ask you to speak up a

little bit and get the microphone close to your mouth so that we make sure we get a good recording.

THE WITNESS:  Yes, ma'am.

BY MR. GANZ:

A    A legal firearm transaction is when someone goes to the gun store and purchases a firearm from a gun store that is federally licensed by the ATF.

Q    Okay.  So, and typically, a gun store, the technical term would be a Federal Firearms Licensee, correct?

A    Correct, sir.

Q    And that is abbreviated as an FFL?

A    Correct.

Q    When someone makes a legal purchase of a gun at an FFL, do they have to fill out any paperwork to complete that purchase?

A    Yes, sir.

Q    What's the name of the form they fill out?

A    It's a firearm transaction record normally known as an ATF Form 4473.

Q    For our purposes of this hearing, what are the key questions on that form that a person certifies in making the purchase?

A    It's Question 21 asking the buyer to answer truthfully are they the actual buyer or the purchaser of the firearm.

Q    Okay.  So, the person says that they certify under

VINCENT LUU - DIRECT BY MR. GANZ 9

penalty of perjury that they are the actual transferee of the weapon?

A    Correct.

Q    Okay.  And in layman's terms, what that means is the person says, "I'm buying this gun, and it's my gun.  It's for me"?

A    Yes, sir.

Q    In other words, they're not saying -- they're not buying it for someone else?

A    Yes, sir.

Q    Okay.  Give us a definition of the term "straw purchasing" as it applies to firearms.

A    A straw purchasing is when someone obtains a firearm on behalf of someone else, and they receive money to do that.

Q    Okay.  Why would someone straw purchase a firearm?

A    Have someone straw purchase a --

Q    Why would someone -- so, straw purchasing is when one person purchases a gun for someone else.

A    Yes.

Q    Why would someone want another person to straw purchase a firearm for them?

A    To avoid law enforcement, or they cannot possess or purchase a firearm.

Q    Okay.  So, either the person is a prohibited person --

A    Yes, sir.

Q    -- and thus, cannot own, cannot possess firearms --

A    Yes, sir.

Q    -- or it's an effort to possibly avoid future scrutiny by federal law enforcement?

A    Yes, sir.

Q    Okay.  Because if the gun's used in a crime and it's recovered, it wouldn't come back to that person?

A    No, it would come back to the original purchaser.

Q    Okay.  What are some of the telltale signs of straw purchasing of firearms?

A    They purchase a large scale of firearms, same make and model repeatedly.  The purchase that they obtain was -- the cost is so high, way higher than they can afford it for.

Q    Okay.  So, when you say a large scale, you're talking about large quantities of firearms?

A    Yes, sir.

Q    Can illegal aliens, in general, buy guns?

A    No, sir.

Q    Can they possess them?

A    No, sir.

Q    I'm now going to talk through the key players in this Indictment.  The Indictment is still sealed to some people, so we'll refer to them by pseudonyms, and then, others have been unsealed, so we can use their names.

A    Yes, sir.

VINCENT LUU - DIRECT BY MR. GANZ

11

Q    One Defendant, let's refer to him as Main Bad Guy for lack of a better phrase --

A    Yes, sir.

Q    -- or Main Defendant, he essentially served as the hub of the wheel of this conspiracy, correct?

A    Yes, sir.

Q    All right.  Defendant Yang has been unsealed, and identified, and so forth.

What was her relationship to Main Bad Guy?

A    Girlfriend, husband/wife kind of relationship.

Q    Okay.  And in terms of the operation of the conspiracy, what was her main role?

BY THE COURT:  I'm already lost.

MR. GANZ:  Okay.

THE COURT:  Main Bad Guy is a sealed individual?

MR. GANZ:  Correct.

THE COURT:  Defendant, okay.  We'll call Main Guy Defendant 1.

MR. GANZ:  Okay.  So, Defendant 1.

THE COURT:  And then --

MR. GANZ:  So, then --

THE COURT:  -- who are you talking about now?

MR. GANZ:  Now, we're talking about Defendant Jin Yang.  She has been unsealed, and Your Honor's copy of the Indictment should have her unsealed.

THE COURT:  Okay.  Thank you.

BY MR. GANZ:

Q    What was Ms. Yang's role in the conspiracy?

A    She is the financer or responsible person, and also organized the firearm transaction with the main guy, the main Defendant, Defendant 1.

Q    Okay, Defendant 1.

And so, she was the one who was moving money to pay for the guns in question?

A    Yes, sir.

Q    Okay.  We now have another Defendant who is still sealed.  Why don't we call him Defendant 2?  And Defendant 2, I believe, was the former owner of an FFL called Super Armory; is that correct?

A    Yes, sir.

BY THE COURT:  Can we call him Defendant 3 since Defendant 2 is Jin Yang?

MR. GANZ:  Okay, let's call him Defendant 3.

THE COURT:  Thank you.

MR. GANZ:  My apologies, Judge.

THE COURT:  No problem.

MR. GANZ:  It's a logistical issue.

BY MR. GANZ:

Q    So, now, we have the straw purchasers, and those Defendants have all been unsealed.  Those were Max Mingze Li

--

A    Yes.

Q    -- Mr. Richardo Arredondo --

A    Yes, sir.

Q    -- Mr. Zhao Ping Li --

A    Yes.

Q    -- Mr. Sifu Zhao --

A    Yes.

Q    -- and Mr. Mingtong Tan?

A    Yes.

Q    Zhao Ping Li has not been unsealed, but what have you found out about Mr. Zhao Ping Li?

A    He passed about two months ago.

Q    Okay.  So, we'll be removing him from the Indictment eventually.

Then, finally, we have this Defendant, Mr. Yiyang Wu, correct?

A    Yes, sir.

Q    All right.  So, let's talk through what all happened. I believe the Defendant 1 and Yang approached Defendant 3, that is the former -- the then owner of Super Armory, correct?

A    Yes.

Q    What did they do?  What did they transact?

A    In May of 2023, they approached Defendant 3 and offered

to purchase the FFL, Super Armory, from Defendant 3 for $150,000.

Q    Did Defendant 3, in fact, sell Super Armory to Mr. Wu and Mr. -- I'm sorry -- Defendant 1 and Defendant Yang?

A    Yes.

Q    Okay.  Was Defendant 3 retained?  Did he play any future role after that purchase?

A    After he sold the FFL to Defendant 1, he was retained as an employee --

Q    And was --

A    -- and working for Defendant 1 and Yang.

Q    Okay.  And he was paid, I believe, $5,000 a month?

A    Yes, sir.

Q    Okay.  What were Defendant 1 and Defendant Yang doing?  What was the whole goal purpose of purchasing this FFL?

A    The whole purpose to obtain this FFL is for them to be able to obtain large amount of firearm that they was intent to hide into a shipping container and ship it to North Korea.

Q    So, they were acquiring guns and smuggling them to North Korea?

A    Yes, sir.

Q    Okay.  Let's talk through the course of dealing of how this all worked mechanically.  I believe Defendant 1 would then give Defendant 3 orders for specific firearms?

A    Yes, sir.

Q    Defendant 3, as an employee -- and often, these were orders with typically large numbers of firearms?

A    Yes, sir.

Q    And often, the same make and model?

A    Yes, sir.

Q    Defendant 3 would then communicate with Yang about payments to purchase these guns?

A    Correct.

Q    Defendant Yang would then transfer money into FFL Super Amory's account to pay for guns?

A    Yes.

Q    I believe you've reviewed banking records in connection with this investigation.

A    Yes, sir.

Q    Is it fair to say that money was transferred from bank accounts in China to Yang, and then from Yang to the Super Armory bank account?

A    That's correct.

Q    I believe there were also some direct transfers from Chinese bank accounts into Super Armory?

A    Correct.

Q    And to be clear, I didn't ask this, but Super Armory was a Houston FFL, correct?

A    Yes.

Q    The straw purchasers would then meet up with Defendant 3 and complete their 4473s?

A    Correct.

Q    Those straw purchasers, themselves, never actually ordered the guns, did they?

A    Never.

Q    And they never paid for the guns themselves, did they?

A    Never.

Q    All right.  So, Defendant 3 would then order the guns, and do the background checks, and create the invoices and the paperwork?

A    Yes.

Q    And then, finally, Defendant 1 was, in fact, living in California at the time, correct?

A    Yes.

Q    Defendant Yiyang Wu rented a room at a house he owned in Houston to Defendant 1?

A    Correct.

Q    All right.  So, then, Defendant 1 would come out to Texas, pick up the firearms, and go back to California?

A    Correct.

Q    Based on your training and experience, why would someone -- why would purchasing an FFL be good if your goal was to traffic firearms?  Why would you go to the trouble of buying a gun dealership?

A    They'd be able to obtain a large amount of firearms without being detected by the ATF.

Q    So, in other words, it wouldn't be unusual for a firearms dealer to purchase large quantities of firearms?

A    No, not at all.

Q    So, the guns were shipped to North Korea.

I believe you interviewed Defendant 1, correct?

A    I did.

Q    What did Defendant 1 say in terms of guns going to North Korea?

A    That he did -- he admitted that he was recruited by a North Korea official when he was in China, and he was offered to receive from $2 to $3 million to obtain firearms and ammunition, and technology to send to North Korea.  In fact, he admitted that he successful sent three -- I'm sorry -- two shipping containers to North Korea.  In fact, my investigation led me to believe that there was a third container already successfully sent to North Korea as well in 2023.

Q    Okay.  And I believe there were text messages between Defendant 1 and Defendant Yang about acquiring things like trucks, shipping containers, and refrigerators?

A    Correct.

Q    As well as shipping containers bound for Hong Kong?

A    Yes.

Q    Let's turn now to Count 3, in which Defendant Wu is named.  The crime accused in that account is aiding and abetting a false statement to a Federal Firearms Licensee. And I believe at the heart of this charge is a purchase of guns by Mr. Max Mingze Li from Super Armory, correct?

A    Yes.

Q    Okay.  To acquire these guns, you said that -- Defendant 1, first of all, what was his immigration status?

A    He was an illegal alien.

Q    So, he couldn't acquire firearms per your earlier testimony?

A    He could not.

Q    All right.  Therefore, he would have needed straw purchasers, correct?

A    Yes, sir.

Q    He had been in contact, Defendant 1, with Mr. Yiyang Wu, correct?

A    Yes.

Q    And according to Defendant 1, Mr. Wu recruited Defendant Max Mingze Li to straw purchase firearms, correct?

A    Yes.

Q    What did Max Mingze Li?  Did Max Mingze Li actually purchase any firearms?

A    He did obtain 22 firearms.

Q    Okay.  Was it 22 or 25?

A       I'm sorry.  25.

Q       So, I believe that was August 22, 2023?

A       Yes.

Q       And Mr. Max Mingze Li purchased 25 guns from Super Armory?

A       Yes.

Q       Do you have a sense of how much those guns would have cost at retail?

A       Approximately $64,000.

Q       Did you do any research as to Mr. Max Mingze Li's reported income with the Texas Workforce Commission?

A       Yes.

Q       How much did he make a year, according to Texas Workforce?

A       Approximately $75,000 a year.

Q       Okay.  I believe he purchased Pardini pistols, correct?

A       Yes.

Q       One Beretta shotgun?

A       Yes.

Q       One Walther pistol?

A       Yes.

Q       For Anschutz rifles?

A       Yes.

Q       And 15 Sig Sauer P226 pistols?

A       Correct.

Q    Based on training and experience, what jumps out about you about that purchase, in terms of indications of straw purchasing?

A    They all repeatedly same make and model, and it was a large quantity.

Q    Plus, I believe his income didn't match the size of the purchase.

A    Correct.

Q    Okay.  Did Mr. Max Mingze certify he was the actual transferee of the guns?

A    He did.

Q    Okay.  You eventually got a warrant for Mr. Max Mingze Li's phone, correct?

A    I did.

Q    And did you recover any photographs of interest relative to this purchase?

A    I did.

Q    Talk to us about that.

A    There was a photo in Max's cellphone containing the invoicing regarding to the August 22 purchase that he obtained 25 guns from FFL Super Armory.  And in that picture, the invoice was taken on a table, a wooden table, and next to the invoice was Defendant 1's California driver's license.

Q    Did you have any geolocation data for that photograph?

A    We did analyze that geolocation data and revealed that the photographs were taken at 9514 Triola Lane in Houston, Texas.

Q    What, if any, connection is there between Defendant Wu and 9514 Triola Lane?

A    It's owned by Defendant Wu and was rented by Defendant 1.

Q    Let's now shift gears and talk about an event that took place at a second gun dealer in Houston called Night Fox, and this transaction or these events form the basis of Counts 7, 8, and 9.

So, first, tell us what Night Fox is.

A    Night Fox is a Federal Firearm Licensee that's operated in Houston, Texas, here.

Q    How did Night Fox come to your attention?

A    On November 16th, Night Fox contacted the ATF reporting a suspicious straw purchasing at their store regarding to 55 firearms.

Q    So, these were 55 -- so, there was an order for 55 firearms?

A    Yes.

Q    Were these the same make and model?

A    Yes.

Q    And I believe these were Sig Sauer P226 pistols?

A    Correct.

Q    How much do these retail for?

A    It's about $1,100 per gun.

Q    So, 55 of these guns would retail for about $60,000?

A    Yes, sir.

Q    You investigated this order, correct, and its origins?

A    Yes.

Q    What did your investigation determine as to the origins of this order, how it ended up -- where did it come from? How did it end up going to Night Fox?

A    These 55 firearms were transferred from FFL Super Armory on November, I believe, November 13.

Q    Okay.

A    And they were transferred to FFL Night Fox Tactical by Authur Kuo and Defendant Wu.

Q    Okay.  So, that's --

        BY THE COURT:  Can you repeat that?  The 55 firearms were transferred from where to Night Fox.

        THE WITNESS:   From FFL Super Armory.

        THE COURT:  From Super Armory.  Okay, thank you.

BY MR. GANZ:

Q    All right.  Defendant 3 was the former owner of Super Armory, and then he was employed by Defendant 1 and Defendant Yang to manage Super Armory?

A    Yes.

Q    What did your investigation determine as to whether or

not, in other words, why those guns were then purchased or transacted through Super Armory?

A    Before those firearms were transferred to FFL Night Fox Tactical, Defendant 3 -- based off the text message communication between Defendant 3 and Defendant 1, I learned that Defendant 3 sent a message to Defendant 1 to tell him that he'd no longer be able to handle the stress, and he would like to have these firearms to be transferred by an FFL.

Q    And I believe the text message from Defendant 3 to Defendant 1 said, "My body can't take the stress anymore."

A    Yes, sir.

Q    Around this time, Defendant 3 was also purchasing guns from other FFLs around the country, correct?

A    Yes, sir.

Q    One of those FFLs through which they purchased guns was called Pardini, correct?

A    Yes.

Q    And Pardini is in Tampa, Florida?

A    Correct.

Q    Did your investigation indicate whether Defendant 3 had told Pardini at this time about whether Pardini could transfer guns to Super Armory?

A    Yes, I learned that Defendant 3 also told that FFL in Florida that the firearm that he placed an order, do not

send it to his store, and Defendant 1 will tell that FFL where to send the firearm to.

Q    So, at this point, Defendant 3 appears to be getting cold feet as part of all this?

A    Yes, sir.

Q    All right.  How did the guns end up going -- based on your investigation, how did the guns end up going to Night Fox?  How did they land there?

A    On November 13th, based off the security camera at the Night Fox Tactical FFL and also the employee statement, on November 13th, Defendant Wu and Defendant 3 arrived at the same time and bring the firearm inside the store, which is the total of about 55 firearms.

Q    Okay, but I believe that there was an introduction by a Mr. Jonathan Shee (phonetic)?

A    That was a couple days before that, yes.

Q    And did Mr. Shee have any connections to any other Defendants in this case?

A    He's a friend of Defendant Wu.

Q    All right.  So, I guess it was through an introduction or a suggestion of Mr. Shee that Defendant 3 ended up bringing the guns with Defendant Wu to Night Fox?

A    Yes.

Q    And you said that Defendant Wu and Defendant 3 arrived at Night Fox at the same time?

A    Yes.

Q    And they carried these boxes of these 55 guns into the gun store?

A    Yes.

Q    Did Mr. Kuo stick around, or did he leave?

A    After he completed the transfer, he left immediately. Defendant Wu stayed around at the store to inspect the firearms and counting the firearms with the employee.  And then --

Q    There's video to that effect?

A    Yes, sir.

Q    What else did Mr. Wu do at that point?

A    Before he left, he told the employee that there would be three individuals coming to the store to complete the firearm transfer for these firearms.

Q    How was Night Fox going to be compensated for transferring these guns to the end users?

A    They would charge the transfer fee for each firearm that they transfer to the three individuals.

Q    What was the total transfer fee for these 55 guns?

A    Approximately about $1,100.

Q    Who paid for that?

A    Defendant Wu.

        BY THE COURT:  Defendant?

        THE WITNESS:  Wu.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

MR. GANZ:  This Defendant.

BY MR. GANZ:

Q    So, now, let's dig into Count 7.  Count 7 charges Defendants 1 and 3, along with now deceased Defendant Zhao Ping Li, and Defendant Wu.  The crime accused is aiding and abetting false statements to a Federal Firearms Licensee. Take us through the events of November 14, 2023, underlying this charge.

A    November 14, Defendant Wu, along with Zhao Ping Li, Sifu Zhao, and Mingtong Tan, arrived at the FFL Night Fox Tactical.

Q    They all arrived together or about the same time?

A    Same time.

Q    Okay.  What happened next?

A    They go --

Q    With respect to Zhao Ping Li, what happened?

A    They went inside and completed the ATF Form 4473 for these 55 firearms.

Q    Did Mr. Zhao Ping Li purchase all 55, or I think he just purchased 10?.

A    He only obtained 10.

Q    Okay, and he certified that he was the actual transferee --

A    He did.

Q    -- on the 4473?

A     Yes.

Q     All right.  Did you review video of that purchase of Mr. Zhao Ping Li?

A     Yes.

Q     Did Mr. Wu appear in the video in any kind of a significant way?

A     He did.

Q     Tell us about that.

A     He was assisting Zhao Ping Li to complete the ATF Form 4473.

Q     Okay.  Mr. Li then passed the background check?

A     He did.

Q     And carried the guns out?

A     Yes.

Q     Did you interview Mr. Li?

A     We did.

Q     What, if anything, did he say about what he did with those guns?

A     He said that he gave the firearms to Defendant Wu?

Q     And did he just hand them right there, or did he deliver them to a house, or what?

A     He didn't say where he did the delivery, but one of the Defendants in this case we later interviewed, he told us that after Zhao Ping Li obtained the firearms, they followed Zhao Ping Li to the address 9514 Triola Lane.

Q    Okay.  So, Mr. Wu is with him at this purchase?

A    Yes.

Q    He helps him fill out the forms?

A    Yes.

Q    And then, our indications are that the guns were delivered to the 9514 Triola Lane house?

A    Yes.

Q    I believe Mr. Li also told you that Defendant Wu brought him to Night Fox and told him to complete the 4473?/

A    He did.

Q    Okay.  And did he say whether he was being paid to make this purchase?

A    He what?

Q    Did Mr. Zhao Ping Li tell you whether or not he was paid money to do this purchase?

A    He did.

Q    Okay.  So, we're talking about 10 guns at $1,100 each? So, that's about $11,000?

A    Yes, sir.

Q    Did Mr. Zhao Ping Li have any reportable income in the Texas Workforce Commission records?

A    No, sir.

Q    Let's shift to Count 8.  Count 8 charges Defendants 1 and 3, Defendant Wu, and Defendant Mingtong Tan.  Again, same crime, accused of aiding and abetting false statement

to a Federal Firearms Licensee.

You said that Mr. Tan had gone to Night Fox on November 14, 2023?

A    Correct.

Q    At that time, did he complete a 4473 for any of these Sig Sauer pistols we've discussed?

A    He did complete the Form 4473.  However, he didn't pass the background check on that day.  He got put on delay status.

Q    Okay.  How many guns did Mr. -- how many of these P226s did Mr. Mingtong Tan purchase or attempt to purchase that day?

A    22.

Q    And so, we're talking about $24,000 of retail for those guns?

A    Yes, sir.

Q    Any Texas Workforce Commission records for Mr. Mingtong Tan?

A    No.  He had some reportable income, but it's not a lot.

Q    Okay.  So, his background check was delayed.  Was his background -- did he eventually clear the background check?

A    Eventually.

Q    Okay.  So, he's there November 14.  You said Night Fox tipped you off?

A    On November 16.

30

Q    So, two days later.  And then, November 17, what happened that day?

A    On that day, Mingtong Tan, Sifu Zhao, and Defendant Wu returned to the FFL Night Fox Tactical to finalize the transaction.

Q    You actually saw them there?

A    Yes.

Q    Because you were conducting surveillance?

A    We did.

Q    Okay.  At that point, Mr. Mingtong Tan, did he, in fact, purchase those guns at that moment?

A    He did.

Q    Okay.  And he walked out of the store, I assume?

A    Yes.  After they successfully completed the paperwork, they carried the firearm out.

Q    Did Mr. Qu exit the store?

A    He did.

Q    I assume you all converted on them?

A    We did.

Q    What did Mr. Wu do when you all, as agents, walked in on the group?

A    He walked away from the scene.

Q    Mr. Tan was later interviewed by ATF, correct?

A    Yes.

Q    And I believe he told you that Sifu Zhao paid for the

guns?

A    Yes.

Q    And that he was ostensibly buying them -- strike that.

So, shifting to Count 9, Count 9 charges Defendants 1 and 3, along with Mr. Qu and Defendant Sifu Zhao.  Same crime, accused of aiding and abetting a false statement on the 4473.

You said that Mr. Zhao had gone to Night Fox on November 4?

A    He did.

Q    And at that point, I believe he completed a 4473 for 23 of the Sig Sauer P226 pistols?

A    That is correct.

Q    And he certified that he was the actual transferee?

A    Yes.

Q    And going back, Mingtong Tan, for Count 8, he also certified that he was the actual transferee?

A    He did.

Q    The 23 pistols would cost about $25,000?

A    Yes, sir.

Q    Did Mr. Sifu Zhao have any reported income on the Texas Workforce Commission?

A    No.

Q    He did pass his background check immediately on November 14, correct?

A     That's correct, sir.

Q     Did he eventually pass it?

A     He did.

Q     You said he returned with Defendant Wu and Defendant Tan to Night Fox on November 17, correct?

A     Yes, sir.

Q     What happened that day?  Did Mr. Zhao, in fact, Purchase and take possession of the 23 Sig Sauer P226s?

A     He did.

Q     He comes out of the store, and you approach him?

A     Yes.

Q     What, if anything, did he say?

A     He said that he obtained he firearms for his boss, who is planning to open a shooting range, and he got paid $500 to conduct this transaction.

Q     Was he paid, or was he going to be paid?

A     He's going to be paid.

Q     Okay.  Did he say whether or not his boss gave him any directions as to what to do with the guns, where to bring them after they were purchased?

A     Bring them back to 9514 Triola.

Q     Okay.  I want to talk about Count 4.  This Defendant is now charged in Count 4, but there's some relevant information that I want to bring before the Court's attention.  Count 4 charges Defendant 1 and 3, as well as

Defendant Richardo Arredondo.  Again, accused of aiding and abetting false statement to a Federal Firearms Licensee.  I believe this count relates to Mr. Arredondo October 29, 2023, purchase of firearms from Super Armory, correct?

A    Correct.

Q    What happened that day?

A    On that day, Richardo Arredondo successfully obtained 12 firearms from FFL Super Armory.

Q    And did he certify himself as the actual transferee of those guns?

A    He did.

Q    How much did the guns cost, do you estimate?  About $19,000?

A    Yes.

Q    Okay.  Does Mr. Arredondo have any reported income with the Texas Workforce Commission?

A    No, sir.

Q    I believe Defendant 1 identified Mr. Arredondo as one of these straw purchasers when you interviewed him, correct?

A    Yes, yes.

Q    Okay.  And I believe also Defendant 1 sent Arredondo's Texas ID to Defendant 3, correct?

A    Yes.

Q    To help effectuate the purpose?

A    Yeah.

Q    This purchase?

A    Yes, sir.

Q    Did you see any photos of Mr. Arredondo's Texas ID?

A    Yes.

Q    What was the address that he listed there?

A    9514 Triola Lane.

Q    Did you interview Mr. Arredondo?

A    One of my agents did.

Q    So, he was interviewed by ATF?

A    Yes.

Q    Did he say anything as to whether or not he actually lived at 9514 Triola Lane?

A    He said he never lived at 9514 Triola.  He lived in the car when he was in Houston, Texas.

Q    Okay --

          BY THE COURT:  He said he never lived at 9514 Triola, and what?

          THE WITNESS:  He lived in his car while he's in Houston, Texas.

BY MR. GANZ:

Q    I believe he's a professional truck driver?

A    Yes.

Q    Okay.  Defendant 3 was interviewed by ATF, correct?

A    Yes.

Q    And I believe he said that Defendant 1 ordered the guns

and that Arredondo never paid for them, correct?

A    That's correct.

Q    Okay.  I want to now shift gears.  We've talked about the substance of the Indictment.  I want to now shift gears and talk about the promoting prostitution that the Defendant has.  The Court will have to trust Defendant to follow the rules and be honest if Judge decides to give him a bond.

A    Yes, sir.

Q    So, first, what, if anything, did your investigation reveal as to information about Mr. Wu's honesty in terms of that prostitution conviction?

A    So, in 2021, he was arrested for promoting prostitution by the Houston Police Department.

Going back to 2006, when Mr. Wu immigrated to the United States, when he entered the United States, he would be processed by US Customs and Border Protection, and he would be fingerprinted at the airport so later he can receive his green card.  That would be embedded into his alien file.

In 2019, an individual named Yang Bing Ling crossing the United States border and got arrested by US Border Patrol, and he got released back to Mexico.  During that arrest, he actually got fingerprinted by US Border Patrol.  And the following year, the same individual got smuggled into the United States.  He later got interviewed

by one of the Department of State Agents.  He told the Agent that he was smuggled into the United States by Defendant Wu and his associates.  And after he got smuggled into the United States, his passport got kept by Defendant Wu.  In that same year, 2021, Defendant Wu was arrested by Houston Police Department for promoting prostitution.  During the arrest, he produced the passport, the Chinese passport that belonged to Yang Bing Ling, and that name was booked into the Houston Police Department and go through the whole Harris County process.

Q    So, Mr. Wu represented himself to the police, to the Court, to law enforcement as Mr. Ling?

A    Yes, sir.

Q    Using the passport that Mr. Ling said Mr. Wu had confiscated from him?

A    Yes, sir.

Q    Following his smuggling him into the country?

A    Yes.

Q    As part of that Harris County prostitution conviction, were any fingerprints taken?

A    It was.  It did.

Q    So, the person who was prosecuted under the name Ling, that person was fingerprinted?

A    Yes.

Q    Did anyone in your investigation, or DSS, or HSI

compare the fingerprints on the prostitution conviction record with the fingerprints that Mr. Wu gave when he applied for his green card?

A    Yes.

Q    What, if anything, did that review find?

A    It's a match.  It's the same person.

BY THE COURT:  So, the fingerprints of Mr. Wu matched the person identifying himself as Ling, using Ling's passport?

THE WITNESS:  Yes.  Yes, ma'am.

BY MR. GANZ:

Q    So, to be clear, this person sitting here was convicted of that crime?

A    Yes.

Q    But under the name Mr. Ling?

A    Yes.

Q    And our evidence to support that is both Ling's statements to law enforcement --

A    Yes.

Q    -- as well as the fingerprint match between the Harris County conviction and Mr. Wu's green card application?

A    Yes, and the booking photo.

Q    And the booking photo, okay.  Tell us about the booking photo.  Did the -- tell us about that?

A    When the individual got arrested for promoting

prostitution under the name Ying, they would take a picture at the booking center.  And that photograph I reviewed, and it's matching with Mr. Wu here.

Q    Okay.  And again, we haven't identified him, but do you know Mr. Wu by sight?

A    Yes.

Q    And do you see him in the courtroom today?

A    Yes.

Q    Would you point to him and identify him by a piece of clothing?

A    He's wearing a green shirt, right next to the Defense counsel.

Q    And this is the Wu you've been testifying about?

A    Yes.

Q    You eventually interviewed Mr. Wu, correct?

A    Yes.

Q    Did you ask him about whether he'd ever been convicted of a crime?

A    Yes.

Q    What did he say?

A    He said no.

Q    And then, did you remind him about this prostitution conviction?

A    I did.

Q    What did he say?

A    He said, "A long time ago."

Q    Mr. Wu was arrested for the prostitution charge on March 28 of 2021, correct?

A    Yes.

Q    And on April 13, 2023, the Harris County Court entered judgment placing him on two years' deferred prosecution?

A    Yes.

Q    So, he will be on, or he was on deferred status through April 13 of 2025?

A    Correct.

Q    Did his court judgment have any prohibitions as to his contact/possession of firearms?

A    Yes.

Q    What was that?

A    He's not allowed to be in possession, transport, or possess, transport, or sale of firearms.

Q    Okay, but you said that on November 14, 2023, he carried guns into Night Fox?

A    He helped Defendant 3 carry multiple boxes of the firearms, containing firearms, into FFL Night Fox Tactical on that day.

          BY MR. GANZ:  Thank you.  Pass the Witness.

          THE COURT:  Thank you.

          Mr. Bennett?

          MR. BENNETT:  Yes, thank you.

One moment, please.

THE COURT:  Sure.

CROSS-EXAMINATION OF VINCENT LUU

BY MR. BENNETT:

Q    Did you review any documents from the Harris County Police?

A    I did a while back.  Yes, I did.

Q    And when you reviewed those, did you learn that Mr. Wu had been successful on bond in the Harris County case?  That is, had faithfully come to court.

A    Yeah, he did.

Q    And did you learn that once he was placed on probation, under somebody else's name, that he had faithfully completed the terms of the probation?

A    No.

BY MR. BENNETT:  May I approach the witness?

THE COURT:  You may, but let me just, for the record, make sure I understand this.

He was on deferred adjudication status through April 13th of 2025?

MR. BENNETT:  No, that's incorrect, and that's why I wanted to approach, Judge.

THE COURT:  Okay.

MR. BENNETT:  May I?

THE COURT:  You may.

BY MR. BENNETT:

Q    Agent Luu, I'm showing you a printout from the Harris County District Clerk's Office, which was made --

BY MR. GANZ:  Judge, could I get a copy of this?

MR. BENNETT:  Yeah, of course.

Why don't you take a look at that while I'm giving a copy of this to the Government, please?

And I have a copy for this Court as well.

THE COURT:  Thank you.  Hand it to Ms. Morgan.

MR. BENNETT:  Thank you, ma'am.

BY MR. BENNETT:

Q    Okay.  So, a printout from the Harris County District Clerk's Office, October 24th, 2025, which is today, and it shows when Yang Bing Jing, not Ling Jing, which was the name that Mr. Wu was arrested under --

A    Jing, yup.

Q    It shows when his probation was terminated.

A    It was on June 4th, 2024.

Q    Okay.  So, he was not on probation until April 2025.

BY THE COURT:  Which line are you on?

MR. BENNETT:  This is the top line, Your Honor, of deferred adjudication terminated.

THE COURT:  Terminated, okay.  06-04-24, okay.

Just to make it easier for me, did any of the conduct at issue in this case occur before June 4, 2024?

MR. GANZ:  Agent, when did the Night Fox transaction take place?

THE WITNESS:  November 2023.

MR. GANZ:  And that is before June 4, 2024.

THE COURT:  June 4th, 2024.  Okay.

THE WITNESS:  That is correct.

THE COURT:  Thank you, thank you.

BY MR. BENNETT:

Q    You've talked a couple of times about Texas Workforce Commission records.

What do those track?  What information is in those?

A    It would track someone's reported income.

Q    And reported income, who reports it?

A    The employer.

Q    Okay.  And so, if someone's self-employed, no reports to the Texas Workforce Commission?

A    Yeah, probably showing in the Texas Work Commission.

Q    If somebody has contract earnings, probably not reported to the Texas Workforce Commission?

A    Depending on if the contract is out of state, yeah, it would not show.  In-state, it would show.

Q    Okay.  What do you base that information on?  Because I'll tell you that I hire contractors, and there's never a report to the Texas Workforce Commission.  There's not one

required.

Why do you think there's one required?

A    No, I never said it's required.  I'm just saying they would report to the Texas Commission --

Q    They could.

A    -- if the company's in state.

Q    I'm sorry?

A    If the company's in state.

Q    They could --

A    Yeah.

Q    -- perhaps.

A    Yes, sir.

Q    Okay, but you'll agree with me the Texas Workforce Commission records aren't a complete record of the money that somebody earns?

A    Not always, yes.

Q    If you consulted the Texas Workforce Commission, it would show that I have no earnings --

A    Probably not, yeah.

Q    -- because I'm my own employer.

A    Yes, sir.

Q    A lot of the information you've talked about here has come from other people who were allegedly involved in this conspiracy.

A    Yes, sir.

Q    In fact, Mr. Yang Bing Jing, the real Mr. Yang Bing Jing, before he talked to the Government about the passport, he had found out about this deferred adjudication probation in his name, hadn't he?

A    I don't know when he found out.

Q    He had made a report that there was somebody who had been put in deferred adjudication probation under his name --

A    He did.

Q    -- and it wasn't he.

A    He did.

Q    Before the State Department or the ATF talked to him?

A    I never talked to him.  The State Department talked to him.

Q    Before the State Department talked to him, he had reported that somebody else was on deferred adjudication probation using his name?

A    I don't know when he reported that.

Q    And if I were to tell you that that's what your reports show, you wouldn't argue it, right?

A    Yeah.

Q    So, Mr. Jing then, the actual Mr. Jing, had some motivation, maybe not to tell the Government the entire truth about his role in that promotion of prostitution enterprise?

A    I don't know.

Q    Mr. Tan, you said, said that Mr. Zhao had bought guns, right?

A    Yes.

         BY THE COURT:  Hold on.

BY MR. BENNETT:

Q    What did he say that Zhao was buying the guns for?

A    What did --

Q    What did Tan say Zhao was buying the guns for?

A    Initially, he's saying that he was convinced by Zhao to obtain firearms for later reselling the firearms to make profit, but then, eventually, he admitted that he bought the firearms for Zhao.

Q    Okay --

         BY MR. GANZ:  Judge, I'm going to object as to relevance.

         THE COURT:  Yeah, what is the relevance?

         MR. BENNETT:  It's a question that the Government asked and then thought better of.  So, I thought maybe you would like to hear the answer.  I'm not going to dig into this further, Your Honor.

         THE COURT:  Okay, all right.

         MR. BENNETT:  I just --

         THE COURT:  Let's move on.

         MR. BENNETT:  Yes, Your Honor.

BY MR. BENNETT:

Q    You testified that Zhao said that he was buying for his boss; who was that boss?

A    He later identified Defendant 1 as his boss.

Q    Okay.  So, Tan said that he was buying for Zhao, Zhao said he was buying for Defendant 1?

A    Yes.

Q    And Defendant 1 said that Wu recruited Max?

A    Yes.

Q    Tan has some motivation not to tell the truth here.

A    I don't know.

Q    Zhao has some motivation not to tell the truth here.

A    I found Zhao very truthful when I interviewed him.

Q    Okay.  Defendant No. 1 has some motivation not to tell the truth here.

A    I found he revealed a lot of information when I interviewed him the first time.

Q    I'm sorry?

A    I found he provided very valuable information when I first interviewed him.

Q    I appreciate that, but he had some motivation to minimize his own role in this.

A    Probably.

Q    Is an FFL transferable?

A    FFL is transferable, yes.

BY MR. GANZ:  Objection as to relevance.

BY MR. BENNETT:

Q    So, when Defendant No. 1 bought the FFL, was the FFL transferred into his name?

A    No, sir.

Q    How does that work?

BY MR. GANZ:  Again, I'm going to object as to relevance.

THE COURT:  Just what is the relevance of this?

MR. BENNETT:  I'm trying to understand this thing that he testified about, put it into context, Your Honor.

30 seconds, please?

THE COURT:  I'll indulge you, but I have a full docket at 2:00.

MR. BENNETT:  Okay.  Understood, Your Honor.

BY MR. BENNETT:

Q    What's the effect of the transfer?

A    So, when Defendant 1 bought the FFL, he could not transfer the FFL to himself because he was an illegal.

Q    Okay.

A    So, he kept Defendant 3 as an employee and maintained his name on the license.

Q    So, as far as the ATF was concerned, it was still Defendant 3's FFL?

A    Yes.

Q    Did you review the offense report in the promotion of prostitution case?

A    I did review it a while back.

Q    Okay.  And did you learn from that offense report that the way that the Houston Police Department decided that Mr. Wu was actually Mr. Jing was that they were retrieved the passport from Mr. Jing's pocket?

A    If I remember correctly, they asked for his name, and he produced a passport to the police officer.

Q    All right.  I'm going to offer you something and ask you if this --

BY MR. GANZ:  We need a copy.

THE COURT:  Yes, give a copy to Mr. Ganz and then to me, please.

MR. BENNETT:  Yes.

THE COURT:  Are you moving to --

MR. BENNETT:  I am not moving to admit it.  I'm just showing it to him to refresh his recollection because he said --

THE COURT:  And the same thing with the County Clerk's record?

MR. BENNETT:  I'm sorry?

THE COURT:  And the same thing with the County Clerk's --

MR. BENNETT:  No, the County Clerk's record, I'm

offering.

THE COURT:  Any objection to the County Clerk's record?

MR. GANZ:  No objection.

MR. BENNETT:  The District Clerk's record.

THE COURT:  District Clerk's record.

BY MR. BENNETT:

Q    What does the underlined portion of that report say?

BY MR. GANZ:  Could we have a page cite and the paragraph cite?

THE WITNESS:  Page 10 of 11.

MR. BENNETT:  What paragraph is it on that page?

THE WITNESS:  First paragraph, Line No. 5.

BY MR. BENNETT:

Q    Go ahead.

A    And on this underline, it's saying that, "At this point, we detained suspect Jing and retrieved his Chinese passport, which identified him as Jang Ping Jing."

Q    And before that, they hadn't asked him his name?

A    Uh --

Q    You can read the previous page if you need to.  Read whatever you'd like if you need to.

A    No, I don't see they asked him for his name.

Q    I'm sorry.

A    I don't see they asked him for his name.

Q    Okay.  So, would you agree with me that they didn't ask him for his name?  They retrieved a passport from his pocket, and they assumed that that was he?

A    Yes, sir.

Q    And to be fair, he didn't correct it at that point or at any other?

A    Correct.

        BY MR. BENNETT:  I'll pass the witness, Your Honor.

        MR. GANZ:  No questions -- actually, one question.

        REDIRECT EXAMINATION OF VINCENT LUU

BY MR. GANZ:

Q    So, just to be clear, he went through the whole Harris County process under that separate name?

A    Yes, sir.

Q    And he was not allowed to have firearms?

A    He's not allowed to have firearms --

Q    Okay --

A    -- during that probation period.

        BY MR. GANZ:  Very good.  Nothing further.

        MR. BENNETT:  No further questions, Your Honor.

        THE COURT:  Is the address where this prostitution charge occurred the hotel that Mr. Wu owns or leases, that he told Pretrial Services he leases?

        MR. BENNETT:  Not that I know of, and I know that

they tell that he leases.

Could the Court refer me to a page in the Pretrial Report?  I'm not familiar with a hotel that he leases.

THE COURT:  Well, it may be what he said to me in court, which is that somewhere I recall something about him leasing a hotel, and they mentioned that he lives at a hotel, or am I thinking of another defendant?

MR. BENNETT:  I think that must be another defendant, Your Honor.

May I ask the Witness?  The Witness might know.

THE COURT:  Sure.

RECROSS-EXAMINATION OF VINCENT LUU

BY MR. BENNETT:

Q    Was there something about Mr. Wu leasing a hotel or living in a hotel that you know of?

A    Not that I know of.

BY THE COURT:  Okay, thank you.

MR. BENNETT:  I think it must have been another defendant.

THE COURT:  All right.

MR. BENNETT:  No further questions, Your Honor.

THE COURT:  Any further questions, Mr. Ganz?

MR. GANZ:  No further questions for this witness.

THE COURT:  All right.  You may step down.

Thank you.

THE WITNESS:  Thank you.

(The Witness steps down.)

MR. BENNETT:  Still your case, I think, Mr. Ganz.

MR. GANZ:  Oh, sorry.  Government has no further evidence to offer.

THE COURT:  All right.  Do you have any witnesses, Mr. Bennett?

MR. BENNETT:  Yes, Defense calls Emily Nguyen, who is on the Zoom.

THE COURT:  She needs to be sworn.

THE CLERK:  Ms. Nguyen, will you raise your right hand?

THE WITNESS:  Yes, how are you?

MR. BENNETT:  Raise your right hand, please.

THE CLERK:  Do you solemnly swear -- does she speak English?  I'm sorry.

MR. BENNETT:  Sorry?

THE CLERK:  Does she speak English?

MR. BENNETT:  Yes.

THE COURT:  She speaks English?

MR. BENNETT:  She speaks English.

THE CLERK:  Okay.  Do you solemnly --

COURT INTERPRETER:  Your Honor, she's of Vietnamese descent.

THE COURT:  Does she speak English?

COURT INTERPRETER:  Yes.

     (The Witness sworn.)

          THE CLERK:  Thank you.

               DIRECT EXAMINATION OF EMILY NGUYEN

BY MR. BENNETT:

Q    Ms. Nguyen, would you introduce yourself to the Court, please?

A    Yes, my name is Emily Nguyen, and I am Yiyang Wu's wife.  So, we are staying at the 2510 Tradewind Pass Drive right now.

          BY THE COURT:  I can't understand what she said. She is his -- she's Mr. Wu's wife and lives at 2510 Tradewind Pass Drive?

BY MR. BENNETT:

Q    Is that correct?

A    Yes.

Q    Okay.  I'm not sure if we have a microphone difficulty on your end, but maybe if you spoke very slowly and clearly, we'd be sure to understand everything you have to say.

A    Yes, I will try.

Q    Where are you right now?

A    I am in Vietnam, right now.

Q    How long have you known Mr. Wu?

A    It's over a year and a half.

Q    Are you familiar with Mr. Wu's life and his business

interests?

A    Can you say it again, please?

Q    Are you familiar with Mr. Wu's life and his business interests, his businesses?

A    Yes.

Q    Okay.  Does Mr. Wu have any dependents, any people who depend on him for support?

A    Yes, he has a lot of people that depend on him.  His mom and his dad is here with him, and none of them speak any English.  They are old, and they have health problems.

Q    Okay.  Let's take this one question at a time, please.

A    Yes.

Q    So, talking about his mom and his dad, how old are they?

A    They are 1950s.  So, they are in their 70s.

Q    Are they -- tell me about the nature of their health problems?

A    Yes.  So, his dad also has knee problems, and his mom's supposed to have a foot surgery on November the 7th.  Both of them are disabled right now.

Q    Do they speak English?

A    No, they do not.

Q    Is there anybody here other than Mr. Wu who can help them and take care of them?

A    No, and he is the only one.

Q    Are you coming back to the US soon?

A    So, I just had a surgery.  So, the earliest day that I can have the clearance to go back to the US is going to be in the middle of November.

Q    But you are coming back?

A    Yes.

Q    When you come back, are you going to be able to take care of the things for Mr. Wu's mother and father that he would otherwise take care of?

A    I am not able to take care of all the things that he's supposed to do.

Q    Do his mom and dad speak Vietnamese?

A    No, they don't.

Q    Do you speak Chinese?

A    No, I don't.

Q    And do they speak English?

A    No, they don't.

Q    Does Mr. Wu have anybody else who depends on him in Houston?

A    Yes, he has a lot of employees that is working with him.

Q    In what business does he have employees working for him?

A    So, he has a business.  He is the founder of DoHVAC, and they are a trade school for like the A/C technicians.

Q    And trade school for air conditioning technicians?

A    Yes.

Q    Okay.  I think that's reflected in the Pretrial Report.

Does that trade school have employees?

A    I do not know exactly how many employees, but yes, they do.

Q    Does the school depend on him to train people?

A    Yes, they do.

Q    Okay.  How so?

A    He is the one who runs all the training courses, and he is the one who obtains and release all their certificates for them.  So, without him, they won't be able to get the certificates for graduation.

Q    Okay.  Aside from DoHVAC, does he have any other businesses with people who depend on him?

A    Yes.  So, he also is the -- he's doing like the remodeling housing, and he have employees, you know, working for him to remodel those houses.

Q    How many employees does he have?

A    He do have a lot, but the one I know is around like three people that I know like in the daily basis that need him.

Q    And do those three people -- are they employed with Mr. Wu is in jail?

A    No, they are actually no employees right now.

Q    Okay.  Is there anybody else who depends on Mr. Wu being out for support?

A    He is managing a lot of rental properties, and some of them are -- he has contract with Houston Housing.  So, he had to take up all the electricity, Wi-Fi, you know, internet, any kind of livable, you know, provide it for them.

Q    Is that his and your major source of income?

A    I'm sorry.  Can you say it again?

Q    Is that his and your major source of income?  Is that your main source of income?

A    Yes.

Q    Is that something that you could take over from him if he remains in jail?

A    No, I cannot.

Q    Why not?

A    It is a lot of property, and I am not familiar with those tenants.  I never had, you know, experience to work with Houston Housing or any kind of like, you know, special tenants like that.  So, I wouldn't know.  And then he has a lot of accounts with them, you know, like water, Wi-Fi.

And even if with the house we are living in right now, I am not even familiar with it.

Q    Aside from you, and his parents, and his employees, is there anybody else who relies on Mr. Wu for financial

support?

A    Yes, his daughter.

Q    How old is his daughter?

A    Ten years old.

Q    And I don't know if I asked this, but his parents rely on him for financial support as well, right?

A    Yes.

BY MR. BENNETT:  All right.  I'll pass the Witness.  Thank you.

THE COURT:  I have one question, Mr. Ganz.

Ma'am, how old are you?

THE WITNESS:  I am 32.

THE COURT:  And how long have you been married to Mr. Wu?

THE WITNESS:  It's been two years, almost two years.

THE COURT:  Two years?

THE WITNESS:  Yes, almost two years.

THE COURT:  Okay.  I thought you said you'd known him for a year and a half.

THE WITNESS:  Yes, a year and a half.  So, when I say two years --

THE COURT:  So, you've known him --

THE WITNESS:  I'm sorry.  It is a year and a half.

THE COURT:  All right.  Thank you.

CROSS-EXAMINATION OF EMILY NGUYEN

BY MR. GANZ:

Q    My name is John Ganz.  I'm the Prosecutor on this case.

You mentioned that Mr. Wu has access to the various records of the accounts, correct, for things like --

A    I'm sorry.  Can you say it again?

Q    You said that Mr. Wu maintains various services like electric, and Wi-Fi, and so forth, correct?

A    Yes.

Q    And he could easily give you the passwords, and the account IDs, and all that for someone else to manage, correct?

A    Technically, yes, but I've never had to, you know, do any of that before.  So, I wouldn't even know.  He has 17 and three of mine.  So, it's over 20 properties.

Q    Right, but you could --

A    And because of housing, he had to a lot of management as well.

Q    But in terms of getting access to accounts, he knows the account IDs and the account passwords, correct?

A    Right now, I do not have it.

Q    I asked if Mr. Wu --

A    I don't have any of them.

Q    Would Mr. Wu have them?

A    He should have it, but I don't know if it has it in his

mind or not.

Q　So, please listen to my question.　Just listen to my question.　Please just answer yes or no.

He has access -- he knows all the account access information, correct?

A　That's what I think.

Q　And so, he could easily just pass that information on to someone else, correct, to manage the accounts?

A　I do not know, yeah, if it's easy or not.

Q　I didn't say if it was easy.　I said is it possible. You have nothing to indicate that he couldn't just simply give over the information to someone else, correct?

A　No, I do not know.

Q　You don't know?　Well, let's --

A　I don't know if it is easy for him to send it, you know, to give it to me for me to log in or what.　I don't know how that one works.

Q　And he could also hire someone to manage the properties, correct?

A　I do not know that either.

Q　You don't know if he could --

A　And like I said, I have no experience with, you know, with any kind of rental property like this before.

Q　Okay.

A　So, I wouldn't know the first thing about it.

Q    I didn't ask -- I'm saying he could hire someone to manage it, correct?

A    I don't know.  I don't know if he could.

BY MR. GANZ:  Okay, all right.  Pass the witness.

THE COURT:  Okay.  I have some other questions.

You said he owns about 17 homes or properties? Are you all earning --

THE WITNESS:  Yes.

THE COURT:  -- between $10,000 and $18,000 a month off of those properties?

THE WITNESS:  I don't know exactly how much it was, but as I know, it's about that.

THE COURT:  And is he making between $10 and $20,000 per month from the Houston Renovation Group?

THE WITNESS:  I think so.

THE COURT:  And do you own a beauty injection med spa?

THE WITNESS:  Yes, I do.

THE COURT:  And do the two of you make between $5 and $20,000 a month from that business?

THE WITNESS:  As of right now, we do not, but yes, we were.  We just started it.

THE COURT:  And how much is he making from the Houston trade school?

THE WITNESS:  I think in the $20,000 a month.

THE COURT:  Okay, thank you.

Any other questions?

MR. GANZ:  None for the Government?

REDIRECT EXAMINATION OF EMILY NGUYEN

BY MR. BENNETT:

Q    Aside from the properties, is there somebody other than him who would run the HVAC trade school or the remodeling business?

A    I'm sorry.  Can you say it again?

Q    All right.  So, Mr. Ganz asked you about the management of the properties.  Is there somebody other than him who could run his other businesses, the HVAC trade school and the remodeling business?

A    I don't think so.

BY MR. BENNETT:  I'll pass the Witness.

THE COURT:  All right.

MR. GANZ:  Nothing further.

THE COURT:  All right.  You may be excused, ma'am. Thank you.

(The Witness steps down.)

THE COURT:  Any other witnesses?

MR. BENNETT:  No, Your Honor, we would offer the, well, ask that the Court consider the Pretrial Services Report, which the Court will, of course, do, and we'd rest.

THE COURT:  I'm taking judicial notice of all

three Pretrial Services Reports.  I have Exhibit 1, which is the Harris County District Clerk record, and I'm also taking notice of the information that was contained in the report that the witness testified about regarding the arrest for promotion of prostitution.

All right.  I'm ready for argument.

CLOSING ARGUMENTS

BY MR. GANZ:  He's indicted.  So, probable cause has been met.  So, now, the issue is, can he be trusted to be on bond?  And the answer is a resounding no.  He was arrested by the Houston Police, and by their own admission, they acknowledge he gave up someone else's passport, went through the entire process, including a conviction, saying that he was someone else.  He lied, he lied, he lied.  He came to court multiple times and lied about who he was when he was asked who he was.

In addition, he was told don't go near firearms.  Don't possess them, don't purchase them, anything.  And the evidence is very clear that he was intimately involved in a major firearms trafficking ring, to include the act of carrying guns into Night Fox, paying for the transfer fees, and then having the guns sent to his house.  His house is also at the center of this in terms of Defendant 1 staying there when he was out from California, and also from Defendant Arredondo using that address for what was clearly

a false Texas ID. You cannot trust him, Judge. You just can't trust him. And there is an element of severe danger here in terms of the quantities and types of firearms, and the fact that he is at the center of it.

In terms of this argument about he's the only one who can do this, first of all, I'm in the wrong career. I --

THE COURT: You don't need to --

MR. GANZ: Sorry.

THE COURT: -- address that.

MR. GANZ: Okay. So, that's it. I just say that he's intimately involved in this, and he lied repeatedly to the Court and also clearly and very flagrantly violated the terms of his probation with respect to firearms. And this Court simply cannot trust him.

THE COURT: Thank you.

Mr. Bennett?

CLOSING ARGUMENTS

BY MR. BENNETT: Your Honor, there is some condition -- I think they're partial conditions, but there's some combination of conditions that will assure both his appearance and the safety of the community. He can be home-confined and run his business from home. He can wear a GPS monitor. He can check in with a Probation Officer.

None of this is -- I don't love it. I don't love

the fact that he's charged with a crime that was allegedly committed when he was on probation, but none of that makes it impossible for him to be released on conditions. And we ask that, pursuant to the report of Pretrial, that he be placed on conditions that will assure his appearance and will make sure that he treads a straight and narrow path between now and the resolution of this case.

Thank you.

THE COURT: Thank you, Mr. Bennett.

COURT'S RULING

BY THE COURT: These are my findings. I do find that the Government has met their burden of proof that the Defendant, by a preponderance of the evidence, that the Defendant poses a severe risk of flight. He has connection, was born and raised in China. He travels extensively for work. He has a lot of assets at his disposal.

With respect to whether there are conditions that I could impose that would reasonably assure his appearance in this case and the safety of the community, I find there are no conditions that I could impose because I find that I do not believe he would follow conditions that I impose. He was on deferred adjudication or probation.

He committed these crimes that he's charged with while on deferred adjudication or probation. That is the number one factor that I look at to see if someone can

follow my conditions is what they've done in the past.  He was very not truthful with US Pretrial on two occasions, and then we have a third report.  He did not tell the truth about where he lives.  He did not tell the truth about his assets.  He did not tell the truth about where he was employed.  And then, you've got the issue of him being convicted of a crime using someone else's identity.

All of those factors tell me I cannot impose any conditions that will reasonably address his risk of non-appearance in this case.  And therefore, I'm remanding him to the custody of the US Marshals pending his trial.  Is there -- I will issue a written order later.  Nope, I'll issue a written order later.

MR. BENNETT:  Thank you, Your Honor.

THE COURT:  Thank you.  You're all excused.

(Proceedings adjourned at 2:10 p.m.)

*  *  *  *  *

*I certify that the foregoing is a correct transcript to the best of my ability produced from the electronic sound recording of the proceedings in the above-entitled matter.*

*/S/ MARY D. HENRY*

*CERTIFIED BY THE AMERICAN ASSOCIATION OF ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337 JUDICIAL TRANSCRIBERS OF TEXAS, LLC JTT TRANSCRIPT #70209 DATE FILED:  DECEMBER 11, 2025*

JUDICIAL TRANSCRIBERS OF TEXAS, LLC