**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **vs.** | § | |
| | § | |
| **SHENGUA WEN,** | § | |
| **JIN YANG aka Jenny,** | § | |
| **DEFENDANT 3,** | § | |
| **MAX MINGZE LI,** | § | **CRIMINAL NO. 4:25-CR-531-7** |
| **RICHARDO ARREDONDO,** | § | |
| **DEFENDANT 6,** | § | |
| **YIYANG WU aka ANDY,** | § | |
| **SIFU ZHAO, and** | § | |
| **MIGNTONG TAN aka Tomato,** | § | |
| | § | |
| **Defendants** | § | |

## GOVERNMENT'S RESPONSE TO DEFENDANT YIYANG WU'S
## MOTION TO REVOKE DETENTION ORDER

The United States files this Response opposing defendant Yiyang Wu's Motion to Revoke The Detention Order (ECF 118).

## I.    SUMMARY.

Defendant was an active member of a firearms straw purchasing ring until his arrest on the instant charges. He recruited co-conspirators into the ring and provided housing, transportation and other logistical and financial support to the group. The group acquired a Houston gun dealer, used the dealer to purchase large quantities of firearms, then smuggled many of those guns to North Korea.

Defendant was identified when federal agents broke up the attempted purchase of over fifty pistols, all of which were the same make and model. Further investigation determined that Defendant had previously been convicted of a felony Texas state prostitution charge—and went

through that entire case *under another person's name*. Defendant, moreover, committed several of the crimes alleged in the indictment while on deferred adjudication for his prostitution conviction. His actions thus convey an utter disdain for the law in general and a court's authority in particular. He is, in short, a repeat offender who cannot be trusted to behave while on bond and should instead remain locked up pending trial.

Defendant's years-long lies to state authorities appropriately figured in United States Magistrate Judge Chritina Bryan's decision to detain him. This record ends any inquiry as to whether Defendant can be trusted to respect this Court's orders if granted bond. Defendant, however, later lied to this Court when he filed a motion claiming to be indigent after telling U.S. Probation that he owned millions of dollars' worth of real estate and that he earned as much as $60,000 a month in income prior to his arrest. ECF 85, 87. When the Government brought this shocking discrepancy to the Court's attention, Defendant hastily hired new, retained counsel. ECF 96.

Defendant's arguments regarding the state of his business and his parents' caregiving needs were before Judge Bryan when she ordered Defendant detained. In that sense, the (largely vague) information he offers now is not "new information" meriting a re-opening of the detention hearing under governing law. The Court should therefore deny Defendant's Motion and keep him detained.

## II.   FACTUAL AND PROCEDURAL HISTORY.

This case began when a Houston gun store called Night Fox Tactical ("Night Fox") alerted the U.S. Bureau of Alcohol, Tobacco and Firearms ("ATF") to a suspect purchase of 55 Sig Sauer P226 pistols. ECF 118-5, Detention Hearing Transcript, at 21.

On November 13, 2023, Defendant Wu and Defendant 3 carried the guns to Night Fox. *Id*. at 24. After delivering the guns, Wu counted the guns, then told a Night Fox employee that three people would come to the store to complete the purchase of them. *Id*. at 25. Wu paid the $1,000 transfer fee that Night Fox charged to effectuate the transfer of the guns to the three buyers. *Id*.

The next day, Wu and three co-defendants—Xiao Ping Li, Sifu Zhao and Mingtong Tan—arrived at Night Fox at the same time. The three co-defendants completed the paperwork to purchase the guns. Wu helped co-defendant Xiao Ping Li complete his forms. *Id*. at 27. Li passed the background check, then delivered his guns to 9514 Triola Lane, Houston—a home Wu owns. *Id*. at 22, 27. (Wu told U.S. Probation that he owned the property, and the address is listed on page four of Addendum 2 to the Pretrial Services Report.) Defendant Wen (referred to as "Defendant 1" during the detention hearing), the co-leader of the conspiracy, rented a room in that home as well. *Id.* at 22.

Zhao's and Tan's background checks were delayed. They cleared on November 17, 2023, so Zhao and Tan returned to Night Fox with Wu that day to collect their guns. *Id.* at 30. Unbeknownst to the three, Night Fox had alerted the Bureau of Alcohol, Tobacco and Firearms (ATF) to the order, because a large order of the same make and model firearm is a classic indicator of straw purchasing. As the three men exited the store, ATF Special Agents converged on the group. *Id.* at 30.

Seeing the Agents, Wu walked away, trying to avoid contact with them. *Id.*[1]

Li, Zhao and Tan were not the only members of the conspiracy. Further investigation

---

[1]Defendant later denied his prostitution conviction when interviewed by an ATF Agent. He thus not only fled law enforcement, he outright lied to federal Agents about his criminal history. ECF 118-5 at 38-39.

identified co-defendant Richardo Arredondo as a straw purchaser. *Id.* at 32-34. Arredondo listed Wu's 9514 Triola Lane address on the Texas state identification card he used to straw purchase firearms, even though he lived in Mexico. *Id.* Co-defendant Max Mingze Li also purchased firearms for the ring. Wu recruited Li into the ring, and a photo found in Li's phone placed Li at Wu's Triola Lane home. *Id.* at 18-21.

Wu was thus an integral and active member of the straw purchasing conspiracy: he recruited straw purchasers, provided housing to ringleader Wen (who lived in California, then traveled to Houston to collect the straw-purchased firearms), transported firearms, helped conspirators complete required firearms purchase paperwork and personally paid the transfer fees for the guns purchased at Night Fox.

This was not, however, Wu's first brush with the law. In 2021, he was arrested by local authorities for promoting prostitution, a felony. *Id*. at 35-39, 50; Pretrial Services Report at 3. When arrested, he gave the Houston Police the passport of a man he had smuggled into the United States from Mexico in 2020. Wu kept the man's passport after smuggling him into the U.S. Wu was then convicted of the prostitution charge under the man's name and served his deferred adjudication under that name. *Id.* That means Wu lied to the Harris County court about his name at *every court appearance*, and lied to state probation authorities *in every contact with them* during the *two-year period* of his deferred adjudication sentence. *Id.*

Defendant committed the crimes outlined in the instant Indictment from August through November 2023. Notably, his deferred status for his felony prostitution conviction ran from April 2023 to April 2025. *Id*. Defendant thus flagrantly violated the terms of deferred adjudication, which included a prohibition on possessing firearms. *Id*. Defendant minimizes this wrongdoing, writing that he "appeared in Court every time he was required to." ECF 118 at 6.

Why wouldn't he appear? He had nothing to lose given that his conviction was *under someone else's name!*

Having gotten away with repeated lies to the Harris County court in his prostitution case, Defendant lied to this Court in the instant federal gun trafficking case. On November 13, 2025, Defendant, through his then-attorney, claimed to be indigent and in need of court-appointed counsel. ECF 85. Defendant, however, earlier told U.S. Probation that he had income of up to $58,000 per month and owned assets valued at over $2.5 million. *See* ECF 87. Indeed, Defendant was so flush with cash that he reported spending as much as $30,000 every time he gambled in Lake Charles, Louisiana, something he did one to three times per month. *See* Pretrial Services Report Addendum 2 at 5, found in ECF 87. Excluding about $550,000 in debt, he was still, by his own report, worth $2 million.[2] Confronted with his lies, a new, retained attorney filed an appearance on behalf of Defendant. ECF 96 (Pretrial Services Report, plus Addendum 1 and 2 thereto).

In short, Defendant is a habitual liar and repeat offender whose criminal career includes alien smuggling, prostitution and firearms trafficking. He has no respect for any court's authority and will, given his past behavior, break the law if freed on bond.

## III. APPLICABLE LEGAL STANDARD.

The Bail Reform Act, 18 U.S.C. § 3142, governs this proceeding. Courts considering a bond request should consider, *inter alia*, the weight of the evidence against the person; the defendant's history and characteristics, including their character, past conduct, criminal history; and whether, at the time of the current offense, the person was on probation or parole. 18 U.S.C. § 3142(g)(2)-(3).

---

[2]Defendant claimed ownership of all of the properties identified in Addendum 2 to the Pretrial Services Report. Several of those properties are, however, listed as owned by one or both of his parents. *See id*. Regardless, Defendant is, by his own account, still possessed of substantial assets.

After being detained, a defendant may move to have the detention hearing reopened "if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of" the defendant as required. 18 U.S.C. § 3142(f)(2)(B).[3]

## IV. ARGUMENT.

Judge Bryan correctly decided the Government's detention motion, and this Court should not disturb that ruling.

### A. THE BAIL REFORM ACT FACTORS DICTATE THAT DEFENDANT BE DETAINED.

The evidence against Defendant is strong: he recruited straw purchasers and provided ongoing logistical and financial support to the conspiracy, one whose object was to smuggle firearms to North Korea. ECF 118-5 at 14. The evidence before the Court shows additional, serious criminal history that includes alien smuggling and a felony prostitution conviction. He is a man of low character, having lied about his name for years to the Harris County court that adjudicated his prostitution conviction. And he was on deferred adjudication and prohibited from possessing firearms when he committed the instant gun trafficking offenses. This Court simply cannot trust him to respect its authority and abide by its rules should he be released on bond. He should remain detained.

### B. JUDGE BRYAN CONSIDERED DEFENDANT'S CLAIMS REGARDING HIS CARETAKING RESPONSIBILITIES AND FOUND IN FAVOR OF DETENTION. DEFENDANT, A SELF-REPORTED MULTI-MILLIONAIRE, IS FULLY CAPABLE OF OBTAINING CAREGIVING SERVICES.

---

[3] Defendant's request that this Court "revoke the bond order" is thus incorrect; he should instead ask to re-open the detention hearing.

Defendant claims that "his parents are not getting the care they need." ECF 118 at 4. The statement he relies on for that claim, however, makes no claims about missed medical appointments or any other lack of care. ECF 118-2 at 2-3. Indeed, the opposite appears true: Defendant's wife Evelyn is, by her own account, devoting substantial time to caring for Defendant's parents. *Id.* Regardless, Defendant brought this exact claim before Judge Bryan, who weighed it and found in favor of detention. ECF 118-5 at 54. Indeed, Defendant's parents were in the courtroom during the detention hearing, with his mother in a wheelchair. The wife's vague claims are thus, for all intents and purposes, not new information. To the extent Defendant's wife complains of being burdened by caregiving for Defendant's parents, the Court may reasonably ask why Defendant, someone worth over $2 million and who regularly spent $30,000 on gambling trips, cannot hire caregivers to assist his wife.

In the end, every criminal risks harm to his family when he chooses to break the law. Defendant, a convicted felon, certainly knew the potential consequences of breaking the law when he joined the firearms trafficking ring at issue here. He nevertheless chose to join in the ring's crimes, and did so while on state deferred adjudication. He cannot disrespect both the law and a Harris County court's authority, then hold up his elderly parents as a shield to protect him from detention. That Defendant helped smuggle arms to an enemy nation while on lawful immigration status makes his crimes that much more offensive: granted the precious gift of legal status in the United States, he used his presence in America to arm North Korea.

### C. DEFENDANT'S CLAIMS ABOUT THE STATE OF HIS BUSINESS ARE VAGUE AND UNVERIFIED.

Defendant next makes vague claims about the declining state of his rental businesses. As with his parents' caregiving needs, Defendant presented these concerns at length during the

detention hearing. ECF 118-5 at 52-57. Defendant's wife now claims, without documentation, that several of his properties are "government housing units." ECF 118-2 at 3. She complains, again without documentation, that "Hiring outside help has been extremely costly . . ." and that without Defendant, "these properties are at risk of falling out of compliance." *Id*. Again, the gravamen of this issue was before Judge Bryan at the detention hearing, ECF 118-5 at 58, and Judge Bryan found in favor of detention. For all intents and purposes, the business-related issues Defendant now raises are not "new information."

Separately, in practical terms, the Court may wonder why Defendant cannot hire a professional property manager to operate the properties in question: his substantial assets and lavish pre-arrest spending indicate he is fully capable of doing so. Ultimately, the risk Defendant's businesses supposedly face result from his decision to break the law while on deferred adjudication—a term he served under a stolen identity. He cannot create the circumstances of which he complains, then use those circumstances as a shield against detention.

## V.    CONCLUSION.

A court that grants a defendant pre-trial bond must be certain that that defendant will follow the rules the court establishes and, most importantly, not commit new crimes while on bond. The record before Judge Bryan and the overall history of this case show Defendant cannot be trusted to do either of these things. He has offered no new information that would suggest otherwise, instead offering largely vague claims about his parents and state of certain of his businesses. For these reasons, the Court should deny Defendant's Motion and leave Defendant detained pending trial.

Respectfully submitted,

NICHOLAS J. GANJEI
United States Attorney

By: */s/ John S. Ganz*
John S. Ganz
Assistant United States Attorney
Illinois ADRC #6289542
1000 Louisiana Street, Suite 2300
Houston, TX 77002
713-567-9000
john.ganz@usdoj.gov

**Certificate of Service**

I hereby certify that I filed the foregoing via ECF on February 3, 2026, which will provide a copy to all counsel of record.

*/s/ John S. Ganz*
John S. Ganz
Assistant United States Attorney

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

**UNITED STATES OF AMERICA**

**vs.**

**SHENGUA WEN,**
**JIN YANG aka Jenny,**
**DEFENDANT 3,**
**MAX MINGZE LI,**
**RICHARDO ARREDONDO,**
**DEFENDANT 6,**
**YIYANG WU aka ANDY,**
**SIFU ZHAO, and**
**MIGNTONG TAN aka Tomato,**

**Defendants**

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

**CRIMINAL NO. 4:25-CR-531-7**

**ORDER DENYING DEFENDANT YIYANG WU'S**
**MOTION TO REVOKE DETENTION ORDER**

This matter is before the Court on Defendant Yiyang Wu's Motion to Revoke the Detention Order (ECF 118). Having considered the Motion and the Government's Response thereto, the Court DENIES the Motion and ORDERS that Defendant be detained pending trial.

HONORABLE KENNETH M. HOYT
UNITED STATES DISTRICT JUDGE